The next case is number 09-1156 Goeddel v. Sugano. Mr. Freeville, when you're ready. May it please the court, I represent Goeddel in this appeal. Today I'd like to begin by discussing written description followed by enablement and with respect to the third issue, dismissal of Goeddel's unpatentability motions will stand on the Goeddel seeks reversal with the board's finding of written description of the Japan priority application on the ground of legal error because the board applied an incorrect legal standard. In the board's general discussion at the beginning of its opinion, it set out the proper legal standard but then did not apply it. I'd like to first point to page 847 of the joint appendix, which demonstrates the legal standard the board in fact applied. Quote, the sequences of mature HFIF DNA or polypeptide are not explicitly disclosed. Those are the subject matters of the counts before us. Well, what's the error, the legal error? Was it the use of the term envision, that one could envision the DNA? In part, yes, but really it was because the court concluded that one skilled in the art could recognize envision, the subject matter of the counts from the application, when in fact the record shows that the inventors did not. So it's using one skill. Whether or not the inventors did or did not, and if the inventor has a notebook back home in the lab showing that he or she did envision it, are you saying that the point is it wasn't shown in the specification? Yes, I am. In other words, you're saying envisionment is the wrong test. It's the wrong test, and whether one skilled in the art could create from whatever's in the application, the subject matter of the count. It's really the applicants themselves, the inventors must describe it in the application, and that's not what we have here. Is this case over if in fact they're not entitled to the Japanese filing date, or is the interference going to proceed then with a shift in who is the senior party? The latter, Judge Newman. It would be needed to have a remand back to the Patent Office to look at the priority issues and other issues that were deferred from the substantive motion phase. When you look at table five of the Japanese priority document, plus night, one skilled in the art might see the sequence there, right? Because you know what the pre-sequence is from night. No, you know what the beginning of the immunoterminal end of mature is from night. Okay, same thing. So you know what it is from night, so why isn't it there? I can't answer why the inventors didn't disclose it, but it is not there. What do you make of the sentence on the page that everyone's focused on, A306450, the sentence that says, it is apparent from the data of the primary sequence that the plasmid encompasses the entire coding region of the protein of the above mRNA, and probably the coding region of the signal peptide, the signal peptide being the segment that precedes the mature interferon 166-amino acid strand. Yes, it says to me, it's almost an admission by the inventors that they themselves didn't find the beginning of mature such that they could identify that the signal was in fact there. They said it was probably there, and to me that doesn't tell you where the signal ends and where the mature begins. So I think it's virtually an admission that they didn't do that. Even though, as Judge Lurie points out, night effectively does that even to almost a casual observer. I mean, it's pretty obvious. I don't think it's obvious. Well, I understand, but it's pretty apparent, let me say, that if you take night and you the 13-amino acids that are identified in night are the first 13-amino acids in the mature protein. There's only one place in this sequence that those 13-amino acids appear in that order. Voila! There's your beginning. I mean, that's not much of a... That's not a great leap forward, right? Well, it's one skilled in the art is taking this disclosure where they repeatedly said their invention was the 187, not the 166, and it's distilling it, operating upon it, coming up with a new invention, which innovators second on do all the time. They start with a disclosure. Well, normally you would expect more than something that, for example, a person with no background in the area, such as myself, reading this, would not immediately spot. I mean, what's frustrating about this case is that this isn't something that takes a person of skill in the art who's trained and with a jeweler's eye to see something buried in the specification and say, aha, this is trivial. Now, your argument, I take it, is it may be trivial, but they didn't do it. But they didn't describe it. That's correct. And in fact, if you go to the beginning of the application, in several instances, I think they say our invention is the entire amino acid sequence. Well, what does entire mean? If you look at page 16, where they talk about night, it's apparent that the plasmid encompasses the entire coding region and the coding region of the signal peptide. Does that mean that the entire coding region excludes the signal peptide? Therefore, it's fibroblast interferon? No, Your Honor. If you turn to page 306436, which is page 2 of the application in the detailed description of the invention, about two-thirds of the way down the page, there's a paragraph that begins with a definition. The entire coding region means the part specifying the whole amino acid sequence of the protein of the human fibroblast interferon in the fibroblast interferon messenger RNA sequence. That's the entire sequence of Table 5, not the subsequence, the fragment that's undisclosed as being the 166 mature sequence. It means the part specifying the whole amino acid sequence of the protein of the human fibroblast interferon in the messenger RNA sequence. Right. So you're saying that necessarily includes the pre-sequence? Yes. The whole protein typically is referred to from the start codon to the termination codon, and that's 187. And in fact, in board fact finding 31 at page A18, they say human fibroblast interferon means the 187 amino acid precursor. So you're saying this isn't a fact question on which we owe deference to, extreme deference on fact questions to the patent office? No, it's not. They applied the wrong legal standard by concluding written description based on what one skilled in the art could do by taking together a prior art reference plus the application. In the face of statements on this same page, 306.436, where the applicant said three times our invention, here it is, a gene which encompasses the entire coding region, right below the human fibroblast interferon messenger RNA has been obtained for the first time by the present inventors. That's what they said their invention was. It's one skilled in the art who says we can figure out mature within it, and that's really what it is. It's a fragment, an undisclosed fragment within the precursor that they now want to claim as their invention. And there's not a word in here that that was their invention. What do you think? There are several references in the course of the application to interferon activity that is the result of various steps of their process. What do you interpret those references to mean? Well certain of those references were not interferon activity from a protein expressed  The discussions of activity had to do with the process by which they isolated the gene where they hybridized mRNA and then separated that mRNA, translated the mRNA in frog oocytes in order to show that there was binding, that they had the right DNA that they were going after. So that had nothing to do with expression in bacteria. In fact what they said in the application was take the entire gene, insert it into an E. coli, and that's how we can make lots of interferon. They didn't describe the sequence of it. I think they probably assumed that bacteria would do what mammalian cells do, and that is flip it off, but there's no evidence that that occurs. And that's why the board had a factual finding which said in order to express mature interferon in bacteria, you first have to take the precursor DNA and modify it to remove DNA encoding the signal sequence so that you don't express it. So what I'm really trying to get at here is, at least in your view, do you think this application represents a misapprehension by the inventors that they had with the 187 amino acid strand the full mature interferon molecule, or does it represent a misapprehension that the 187 amino acid strand, including the signal, even if it did include the signal, still had the same level of interferon activity? I think the latter. I think they assumed two things. Either if they would express the full length 187, it would be biologically active, or if they would express a gene encoding the full 187, it would be clipped by the bacteria to make the mature, which would be biologically active. And neither of those, there's no evidence of either of those being correct here. What we have is the board's finding that you have to modify it at the DNA level, take away the DNA encoding the pre-sequence, express directly the DNA encoding the 166, and that's the way to get mature. So in effect, their references to interferon activity, I think I understand this to be what you're saying, is that they stumbled across that because they didn't realize that what was happening is when they were putting this into the mammalian cell, there was clipping going on. They may have known there was clipping going on, I don't know. But the only activity they described in the application is not expression in bacteria. I see. It's just the hybridized mRNA that they translated in a frog egg that gave them activity. That tells them they're on the right track. And what do you make of their reference to night back on this critical 306, 450? If you go back to 450, there are two statements they make, and one of them is that it's important that the sequence there exists without any errors, the base sequence, three base pairs, corresponding to the amino acid sequence from the immunoterminal to the 13th amino acid of human fibroblast interferon reported by night. Here's the key. The fact proves that this number 319-13 plasmid has the human fibroblast interferon mRNA sequence. They use the fact that the night sequence was coded by that DNA to show they in fact cloned the right gene. They got the human interferon gene as opposed to some other gene. They didn't refer to night to say, hey, that's how you find where mature begins, and we want to make mature. They never even said they wanted to make mature. That was not part of their invention. And then if you go down to the next sentence, it says, it is apparent from the data of the primary sequence that the plasmid encompasses the entire coding region of the protein of the above mRNA and probably the coding region. They didn't even know for sure if the coding region was there. How could they have identified what mature is if they weren't even sure of the pre-sequence or the signal sequence? They didn't even know it was there. It's probably there. Well, then how do you know where the beginning is? I submit that under Fierce and Lilly, in a situation like this, and this case goes back to 1980, the same case, the same Japanese case as in the Fierce interference itself, Sugano was the third party that prevailed, I submit that they must describe the entire molecule with precision. And that means the beginning, the end, and everything in between. And they didn't describe the beginning. Now, you have said that you think the board applied the wrong legal standard for description. Now, suppose we agree with you that the board sort of hopped over the necessary element. They went directly from a person of skill in the art to reading the application as opposed to a person of skill in the art understanding that the inventors had possession of or had invented the particular invention. If that's true, if we agree with you in that regard, would we send it back for the board to do a reassessment of the facts in light of the new legal standard? Or are you asking us, as I suspect you're going to say you are, to say that the board couldn't possibly, under any circumstances, reach the contrary conclusion from the one that you reach, which is that this evidence cannot support, factually or legally, a conclusion of satisfaction of the written description requirement? Yes, the latter is correct. Because there's nothing in here to indicate that the board determined what the inventors knew. The record is bare with respect to any identification in the application of where the mature begins. So I think it should be concluded here that there is no written description, and it should be sent back for other issues. But don't you agree it's not a question of what the inventors knew, but what they disclosed? Absolutely, Your Honor. OK. Let's hear from the other side. Thank you. Thank you, Mr. Friedman. Mr. Levine. Good morning, Your Honor. May it please the Court. Is it Levine or Levone? Levine. Thank you, Your Honor. May it please the Court. On written description, I think that Judge Bryson's point had it right, that even to the casual observer here, even a casual observer, not even a person of skill in the art, can see that the mature protein is disclosed here, and that's for a few reasons. First of all, the 931 application discloses the full sequence of the 187 amino acids. Just to be sure that we're on the same wavelength here, I didn't suggest that the casual observer could see that it was disclosed. What I was positing was the casual reader could see that you could figure out from this where the mature interferon gene began and ended. Maybe it's not a huge leap, but it's an important difference from that and saying that it was disclosed. Fair point. And in fact, to me, that's the whole case. And I don't think that that is actually a correct legal distinction, and I'll explain. But in addition, I do think that whether or not the casual observer can or cannot, the most important question here is whether a person of ordinary skill in the art can. I wanted to start with the application and tell you why even the lawyer sitting in the courtroom here today can say that the inventors disclosed it, and that is because they disclosed the full sequence. Then, as we've all been focusing on, on the page that you appropriately pointed to, on page 16, it said that inventors themselves there say that it's important that in the terminal chain that Knight disclosed as being the beginning of the mature protein. So they're saying it is important in here that we have those 13 as the mature. A person of skill in the art knows what those 13 are, so they know where the mature starts. Then, regardless why the inventor is saying that, the inventor also says, as you go down to the third sentence on page 16, that further, it's apparent from this that the plasmid encompasses the entire coding region of the protein and probably the coding region of the signal peptide. Now, probably the coding region of the signal peptide does not mean you don't know where the signal peptide ends, as my opponent said. We know from Knight where the mature begins, so we know where the signal peptide ends. We do. We do. But were they disclosing that? Anyone reading this knows, because they are saying this is where the mature starts. The reason they're saying probably, they don't necessarily... Who's the they now? The inventors. The inventors. So they are saying right here, the plasmid we have here encompasses both the entire coding region for the protein and probably the coding region for the signal peptide. I submit that entire coding region of the protein means the entire coding region of the mature. But the count of the interference is limited to the mature, is it not? That is absolutely correct, and so what we are saying is that there is written description support here. But let me jump to the more important point, which is the person of ordinary skill in the art. Let's not... But isn't that the issue? We're talking here about priority contests, so we're not that... And this is something that isn't clear to me either. You're seeking the benefit of the Japanese application for purposes of conception, or constructive reduction to practice, or actual reduction to practice, or what? It seems to me, I'd always thought that the requirements for written description and enablement which related to what is disclosed to the person of ordinary skill in the art is distinct from what must be proved at the threshold of a priority contest, but it does look as if these are either intertwined or else the rules have changed. Well, the standard for... We sought priority based on the constructive reduction to practice in the Japan 931 application. But that's... In which case, you do have a heavier burden, do you not, in terms of written description? Under Gestelli, we do have to show that there was a written description of the test under this court's case. Now, not of what they said they had, which is undisputed. I think it's undisputed that they didn't have the mature interferon at that time. It's certainly not described in the Japanese application, and that it was later obtained. No, that is not... But that would come out in testimony and in evidence, so we're really looking solely at what's in the content of the Japanese application, and this is where the count of the interference becomes critical, does it not? Wasn't there a subsequent application that had the mature? There's a subsequent application that, on page 22 of their brief, they concede has a written description. The difference is that it has a number, number 1, negative 5, negative 21, over the exact same table that you see on table 5. The test here, Judge Newman, is whether or not there is a written description in the specification in the 931 application. It is not whether or not there was any actual reduction to practice. Well, isn't it a slippery slope to say, well, you can envision it, you could get to it, you could figure it out, and didn't we hold in Lockwood that that which is obvious isn't necessarily disclosed? You're talking about getting a patent, getting priority here. You need to have it disclosed, not being apparent or figureoutable or obtainable, but there. Your Honor, we do believe that we have disclosure here. The test under the court's cases is whether this disclosure would reasonably convey to one of skill in the art that the inventors possessed it at the time. That's how the standard is stated in VASCAT. Here, let's put ourselves in context at the time. At the time, there was no dispute that everybody knew that there was a signal peptide for interferon beta. Just like people in the art knew there were signal peptides with many proteins. There was no dispute, and my opponent even stated it, it's at finding effect number 45 in the board's opinion. I think that's at A22 in the appendix that says everyone of skill in the art knew that you had to remove the leader pre-sequence in order to express mature interferon beta in bacteria. That was known. When a person of skill in the art comes and they turn to page 16, and they see that the have the mature protein, and you know exactly where it starts, because persons of skill in the art know what Knight says. You don't have to re-disclose what Knight said again here. Under this court's cases like Capon and Falco Gunter, they say you don't have to re-disclose amino acid or nucleotide sequences that are already known in the art. The reference to Knight- If you want to claim it, you have a different burden. The question here is not whether or not we claimed it at the time as a claim in the invention. The question now is when we have a later claim, is it supported by the written description then? Would this have conveyed to a person of ordinary skill in the art that the inventors did possess it? You want to make the count, so you must be able to claim it in order to make the interference count. That is correct. We claim that you could claim it based on this written description. There's evidence in three places in the record that this would convey to a person of ordinary skill in the art that the inventors did possess it. First, Dr. Roberts, Sugano's expert, testified below that it would have been immediately known, that it would have been immediately understood by a person of ordinary skill in the art, the location and the presence of this pre-sequence. That testimony is at A306559, it's paragraphs 105 and 106 of his declaration. Sugano also stated that as a statement of material fact on the benefit motion, that was statement of material fact 28, which is found at page 1922, and Goodell conceded that it would be immediately known to a person of skill in the art where the mature sequence started within there. And then you have Dr. DeRink, Goodell's expert, who concedes, and the board notes, that one of ordinary skill in the art would be able to envision this. We don't see that. The board knew the standard on written description. The board did not say that it would have been an obvious variant over what we had disclosed in the 931 application. The board was saying that based on the very disclosures on page 16 of the Japan application, one of skill in the art would recognize it. They did not use envision to say that someone would have taken the 931 application and then gone back to their laboratory and created it. Envision is a word that's even used in this court's opinion in fears. This court has used language such as visualize, recognize, to articulate the written description standard. So the question is, would a person of ordinary skill in the art recognize the later claimed invention in the prior application? Not so sure. This is really what I find troubling. If in fact the 166 amino acid product could not have been claimed based on the, in the Japanese application because it's not described, there wouldn't have been a need for the subsequent filing with the additional data, which were completed and which aren't at issue here. But if it couldn't have been claimed in the Japanese application, how can it meet the written description requirement for the interference count purpose? I want to be clear. I am not taking the position that we could not have claimed it in the 931 application. My position is we certainly could have claimed it in the 931 application. That there was written description support for all of the reasons that we've said. Everything that is on page 16 of the Japan application shows that we do possess the 166 amino acid protein and the DNA encoding it. Just because we did later claim it doesn't mean that we could not have claimed it earlier. And just because- No, it doesn't mean that you could have. Of course. And this is really the question, unless you could have, the requirement is not met, is it? I don't, it is not. And I don't dispute you, but it is met here because we could have claimed it. I am not saying that simply because we did claim it later shows that we could have claimed it before. I am meeting the court on the very turf of what the written description standard is and asking, let's just look at the 931 application and let's look at the evidence in the record as to what a person of ordinary skill in the art would view, would recognize in the 931 application. And my position is this is not like a Lockwood case. This is not like a Gentry Gallery case. In Lockwood or Gentry Gallery, there was no disclosure whatsoever of the personal computer with a video disc player in the parent application. And there was no disclosure whatsoever of the couch with the controls on the side. But we can all turn to page 15 and we know that the 166 amino acid protein in the DNA encoding it is here. The question is, did we highlight that presence here? And we did on page 16. What this court's decision in fears in a previous version of the interference over interfere on beta said, and what has now been repeated in many cases since then, Lilly, Amgen, is that the way you constructively reduce to practice a compound such as a DNA or an amino acid is you describe its structure. So the question is, have we described that structure here? And we have. Our opponent says, well, you've only put it here as part of the 187. But there is no rule that says just because you have disclosed a longer sequence, you can't also have disclosed a subsequence to a person of ordinary skill in the art. The clearest evidence of that is this court's decision in Enzo. Now, the primary issue in Enzo was whether or not the deposit could satisfy the written description standard. But there were some additional claims in that case, claims four and six, that were claims to subsequences or mixtures or variants of. And what this court said in remanding the case back to the lower court was, this is a written description is a fact question, and you have to figure out whether or not a person of ordinary skill in the art would glean from the deposited sequence the subsequences that are within there. Well, that's my question. And your test is that if I understand it, particularly in light of what you just said, your test for written description is, correct me if this is wrong. The invention is described if a person of ordinary skill in the art would glean from the specification that the invention in question is present in the specification. Even if the specification doesn't specifically identify the invention, or even if hypothetically the inventor, him or herself, has no idea that that is in fact what a person of skill in the art would conclude. I would disagree with your statement of that as being my statement on three different parts. First of all, the glean, I don't know, but I was only repeating your words. The court in Enzo said glean. I think that what the more standard description through the cases has been is what a person of ordinary skill in the art recognized. So that's where I would start. But then you had two even ifs at the end, which I don't agree are even ifs in this case. I understand, but I'm asking not, never mind this case, is that your standard? It is not the even if the inventors, I can't remember your second even. Even if the inventors did not appreciate what a person of ordinary skill would promptly appreciate. In other words, are we talking about an objective standard here? Are we saying that the way you can tell whether there's a disclosure is what a person of ordinary skill would take away from the specification, that is to say, would a person of ordinary skill be able to say, well, I see what's in the specification and I can infer from that because of my knowledge that that reveals to me more than is disclosed expressly in the specification. I don't, that's not the standard that we think that you need to apply in this case for us to prevail. Absolutely not. We do not think that there's any inference that has to be made. The testimony in the record was that it would be immediately known to a person of skill in the art. But that's the inference. Well, I mean, we can all debate about how many inferences, you know, every time you say a word, I'm making an inference that I know what the word means from the past. But here, regardless of that, what I'll say is that persons of ordinary skill in the art would recognize this here. They would see that it was actually there. And it is an objective standard. I think the real key to your question is, is it a subjective or an objective standard? And the way that this court's case is put it is they say, would a disclosure reasonably convey to one of skill in the art that the inventor possesses it? So it's not a question of, does it objectively convey to someone that there is a subjective intent to possess? It's just, would they be in possession had they constructively reduced it to practice? And perhaps, I mean, I think Enzo is evidence on that. I think the clearest evidence, in fact, is a case that we're citing on the enablement point, which is Martin versus Johnson. There you had a case where the parent application was a claim of two compounds that were mixed together. The later claim that they were seeking priority for in the original application was one of those compounds. Even though the parent application said it was essential to mix the two. And the person opposing priority said, well, you can't do it. The inventors themselves didn't regard that as their invention at the time. And this court's predecessor said that the written description is not dependent on the subject matter regarded by the applicants as their invention in the earlier application. It turns on whether the, and then they italicize, disclosure requirements of the first paragraph of section 112 are met with respect to the subject matter now claimed. This means that it is of no moment that the applicant may have earlier regarded as essential the use of two herbicides. Now again, I don't even think you need to get to the objective subjective here because I think that page 16 already shows you that a person of ordinary skill in the art would recognize in this very invention that this is what they were claiming. They were not only claiming a 1987 amino acid and a DNA encoding for it. They are saying that it is clear that this sequence encompasses, they use the word encompass, encompasses the entire coding region of the protein and probably the coding region of the signal peptide. And I submit, I don't think it's actually important one way or the other here, but I submit that entire coding region of the protein means the mature protein. Because you can't say you have the entire immature if you don't even know you have all of the signal peptide, which necessarily makes up part of the immature. Does that answer your question more or less? Okay. Thank you.  We have the argument, Mr. Levy. Thank you. Thank you. Mr. Freewill, is there a supra requirement for written description for biotechnology inventions and should there be? No, there is not. I think if you go back to the Fierce case, the Lilly case, it simply asks that you describe with specificity the molecule. And in this instance, as in those two, it requires the entire molecule, start, end, and what's in between. With respect to the Martin case mentioned by my colleague, there's a vast difference between having two compounds mixed together and then claiming one. You have both of them in the mixture. That's not what we have in Table 5. We have one sequence. Embedded within it is the precursor and the mature, but it's one sequence. It's not like you can, you know, spill one out from the other like you could in the Martin case. So I don't think Martin applies with respect to written description at all. I think what we really need to do as well is put our minds back 28 years ago when these applications were filed. And I think that highlights a lot of what the case law has done since does not apply here. I mean, a lot has happened in the science in the last 28 years and the mind should be back in 1980 here. I didn't get to my discussion of enablement. May I please explain just a bit? Thank you. On enablement, as I mentioned, the board concluded as a factual finding that you must modify the DNA encoding the precursor in order to get a DNA encoding the mature. And that's the only way to make it in bacteria. There's nothing in the application here that tells you you need to do that. There's nothing that says you need to modify that DNA. Nevertheless, the board went outside the application to look at references, never before cited in the application. In order to accomplish something, the application said didn't need to be done. The applicants here said their invention was complete upon cloning the full-length precursor and putting the full-length precursor into a plasmid for expression in E. coli. There was no motivation to modify that DNA at all. And yet the board concluded one skill in the art would somehow modify that DNA and oh by the way, there are references in the art to do that. We think that was legal error. My colleague referred to several so-called concessions or admissions by Goodell to the effect that one skilled in the art could have envisioned these molecules. I submit that if you look at every one of them, it's couched in terms of what one skilled in the art could do and followed by the statement, but Sugano's Japan application did not do it. And so I think that's quite meaningful when you look at either responses to material facts in the motions, when you look at Dr. DeRanks, the expert of Goodell on whose testimony the so-called concession the board relied on, the board conveniently omitted the next sentence in the paragraph which said Sugano's applications, however, did not do so. We think that's really important here. You no doubt followed my exchange with Mr. Levine about the question of whether we're talking about an objective or subjective or partially objective and subjective test here. Do you view this as this test for written description as having a subjective component? I think it's, Your Honor, it's a very... Or is that an unhelpful way to divide the universe? Well I think it's very difficult to administer a written description requirement if you're talking about subjective intent of the applicant. I think it needs to be an objective standard. Well I guess what I'm saying when I say it's subjective, and that may really not be the right term, is, is it necessary for the applicant to demonstrate that the applicant has adverted to that which has been disclosed? That is to say, is the applicant... You have to be able to infer from reading the application that the applicant knows, as in this case, that there is, that the application has disclosed the mature protein. That's correct. Or is it enough that a person of skill in the art would say, it's there. It's disclosed there, even if they didn't realize what they had. No, I think the applicants have to disclose their invention. Well yeah, but that leaves open the question of what disclose means. In other words, the applicant... Mr. Levine is saying, I think, and I hope I'm not distorting his words because he doesn't have a chance to correct me, but I think his point is that it is really critical whether the applicants themselves actually adverted to the fact that they had disclosed the 166 amino acid strand because they had. By virtue of what they wrote here, you could come along and look at that and say, it is disclosed. And the way we know that it's disclosed is because one of skill in the art would look at that and say, sure, they may not have realized it, but if so, then shame on them, they just weren't paying attention. Well, I think in this instance it's important to look at what was disclosed. And I think Judge Newman alluded to the fact that we have counts here. And the DNA count says, the DNA sequence encoding the 166 amino acid mature molecule unaccompanied by DNA encoding the pre-sequence. So when you see it in Table 5, it's not unaccompanied by. And with respect to the protein, the protein says, the count that is, says a protein having a total of 165 or 66 amino acids. That's not what you have in Table 5. You have a protein that has 187 amino acids. So despite that the 166 in the protein case is there, it's not unaccompanied by pre-sequence, it's not a total, it's, you know, the disclosure is a total of 187, not 186. And I think you need to demonstrate that in these inventors' minds, they were, in the disclosure, excuse me, thank you, in the disclosure, they intended to describe the 166. Intended? I mean, this is, to me at least, maybe I'm being idiosyncratic in this regard, but to me this is an important distinction, because this case may actually turn on that precise distinction. But I submit if you talk about this intention as being a necessary part of the evaluation, go back to this page 436 in the application, what they said the detailed description of their invention was. They characterized it as the entire coding region specified. So it isn't intent at all, it's what they disclosed. It's what they disclosed to one skilled in the art, what they conveyed. Well, but if the question is what they conveyed to one skilled in the art, one skilled in the art looks at this and says, well, I can see that we have here the 166 because we just subtract 9 from the 187, voila, we got it. And they disclosed 9 and they disclosed the 187. So that part of the analysis, it seems to me if we put it that way, then they're probably all right. But if we say what do they have to actually disclose so that the person of ordinary skill in the art would not merely say I can infer this protein from this disclosure, but rather say that's where the protein is recited, then that's a different matter. You're saying it's the latter. I say they have to say this is the molecule, this is the start, this is the end, and this is what's in between. Okay. Okay. Thank you, Mr. Freebill. Thank you. Now, Mr. Levine, we allowed Mr. Freebill to mention enablement. I know it's fully discussed in the briefs. Do you want to respond very quickly to what he said or leave it to the briefs, whatever you prefer? I can do it in 30 seconds if you'd like. The argument simply is that... Give us a minute on the response because Mr. Freebill didn't get to say very much either. Yes. The board fully knows what the Genentech decision said. It cited it and it cited the relevant principle saying that the novel aspect of the invention is what has to be in the parent application from which you're seeking priority. We're talking about enablement only. Enablement. And here it is. I mean, what he is saying is that if he wins written description, there's no enablement because then we don't have a description of the compound that's trying to be made. That's in the briefs. Right. If we're right on that, then everything else, we don't need to have a reference to the other things. It's what if a person reading the specification could make it. And you're right. That's in the briefs. So we'll rest on that. Okay. Thank you. Thank you both. The case is taken under submission.